**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SABER A. IDIAS, d/b/a Nashville
Supermarket,
             *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA; DANIEL
GLICKMAN, Secretary, Department of
Agriculture, in his official capacity
as Secretary of the United States
Department of Agriculture,
             *Defendants-Appellees.*

No. 03-1619

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-00-793-5-F1)

Argued: January 23, 2004

Decided: March 8, 2004

Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Luttig and Judge Michael joined.

## COUNSEL

**ARGUED:** William Webb Plyler, MCMILLAN, SMITH &
PLYLER, Raleigh, North Carolina, for Appellant. Neal Irving Fow-

ler, Assistant United States Attorney, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Frank D. Whitney, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellees.

---

## OPINION

WILKINSON, Circuit Judge:

Plaintiff Saber A. Idias owns and operates a grocery store that was disqualified from the federal Food Stamp Program by the Food and Nutrition Service (FNS) of the United States Department of Agriculture. The FNS had detected a pattern of suspicious activity in Idias's store, most importantly that Idias occasionally collected more in food stamp reimbursements than he reported in total sales. Idias was at a loss to explain these discrepancies to the district court, and it awarded summary judgment to the United States. We now affirm the judgment.

### I.

Idias runs the Nashville Supermarket ("Supermarket") in Nashville, North Carolina. On June 15, 2000, the FNS notified Idias that he was being charged with food stamp trafficking, which is "the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. § 271.2. The FNS's allegations were based on the Supermarket's Electronic Benefit Transfer (EBT) debits for the period from January to June 2000.

The EBT system is the modern replacement for traditional paper food stamps. Each food stamp recipient may purchase food stamp-eligible items by use of an EBT card with a magnetized strip, similar to an ATM or a debit card. A retailer simply totals a recipient's purchases, and then swipes the customer's EBT card through the retailer's point-of-sale device. The customer's food stamp account is then debited, and the retailer reimbursed, for the amount of the purchase. Because EBT debits are electronically recorded, the records can be scanned by various computer programs for irregularities and abnormalities.

According to the FNS, its analysis of the Supermarket's EBT records had "establish[ed] a clear and repetitive pattern of unusual, irregular, and/or inexplicable" food stamp sales. The FNS contended that the Supermarket had an excessive number of large transactions for its type of store, in addition to multiple transactions on the same cards within short time frames. Specifically, the FNS forwarded to Idias with its June 15 letter a list of eighty-eight such transactions that it considered irregular. In response, Idias submitted a statement from his accountant, but the FNS was unpersuaded, and on June 28, 2000, it permanently disqualified Idias's Supermarket from the Food Stamp Program. The FNS's decision was upheld on administrative review, and Idias then filed suit to challenge the administrative determination.

During discovery before the district court, Idias produced the summary tapes generated by the Supermarket's single cash register. The register tapes show information like the store's daily gross sales, the number of items sold, and the number of customer sales. In addition, each item sold is categorized as either Grocery, Hot Food, or Food Stamps, and the register tapes show sales information broken down by these categories. Idias testified that he used the Food Stamp category for all non-taxable items, including items purchased with food stamps and items purchased with Women, Infant, and Children vouchers issued by the state of North Carolina.

Margaret Davis, a certified public accountant, compiled reports that compared the register tapes to the EBT data collected by the FNS over the period from January to June 2000. Davis's reports revealed a number of irregularities. Most importantly, on three different days during that six-month span, the daily EBT debits exceeded gross sales as reflected on the register tapes. In other words, Idias rang up more on the EBT terminal in food stamp sales than he rang up on the register in total sales — even though total sales included purchases of items not eligible for food stamps.

In addition, on thirty-one different days, the EBT debits exceeded the register tape totals for transactions recorded in the Food Stamp category. All told between January and June 2000, the Supermarket processed more than $10,000 in EBT debits not reflected in sales recorded in the Food Stamp category on the register tapes. Finally, there were forty-nine purchases that the FNS deemed unusually large,

and forty transactions in which multiple EBT debits were made using the same card within a matter of minutes.

Faced with this mound of circumstantial evidence, the district court found that the United States had presented a prima facie case that Idias had trafficked in food stamps. The district court further found that Idias had offered nothing more than speculation to explain many of the suspect transactions. For instance, as to how EBT debits possibly could have exceeded gross sales, Idias merely mused that "there must have been EBT sales which were not entered in the cash register at all" — even though Idias and his accountant, Lawrence E. Alford, had already testified that all sales passed through the register. The district court concluded that Idias's surmise did not create any genuine issues of material fact, and it therefore granted summary judgment to the United States on its claim that Idias had trafficked in food stamps. Idias now appeals the district court's decision.

## II.

The Food Stamp Program was established by Congress "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011 (2000). Given the importance of providing nutritional assistance for the needy, Congress has been quite firm in ensuring that food stamps are used only to purchase eligible food items, and are not exchanged for cash or other things of value. *See Traficanti v. United States*, 227 F.3d 170, 174-75 (4th Cir. 2000) (discussing "strict liability regime" established by Congress to prevent food stamp fraud). In fact, a store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

In the present case, the FNS imposed precisely the penalty required by Congress: based on a pattern of suspicious EBT activity, the FNS disqualified the Supermarket from participating in the Food Stamp Program. The FNS's decision was subsequently upheld on administrative review. Idias then sought judicial review of the FNS's decision, *see* 7 U.S.C. § 2023(a)(13), specifically, de novo review before

the district court of the validity of the Supermarket's disqualification, *see id.* § 2023(a)(15).

There can be little question that the United States made a strong case for food stamp trafficking before the district court. It presented evidence of a pattern of irregular and suspicious activity, including that (1) on several occasions, total food stamp debits exceeded the store's documented total sales; (2) total food stamp debits systematically exceeded the sales categorized as food stamp sales on the store's register tapes; and (3) large food stamp debits often occurred in quick succession, sometimes even using the same EBT card, despite the Supermarket's modest size.

There can also be little question that the United States was entitled to use this sort of documentary evidence to prove that Idias trafficked in food stamps. *See Kahin v. United States*, 101 F.Supp.2d 1299, 1303-04 (S.D. Cal. 2000) (rejecting the notion that store personnel must be caught "red-handed" trafficking in food stamps). Congress expressly authorized the FNS to consider "evidence obtained through a transaction report under an electronic benefit system" in disqualifying food stores for food stamp trafficking. 7 U.S.C. § 2021(a). And the FNS has done exactly that, issuing regulations that permit a food store to be disqualified from the Food Stamp Program on the basis of "inconsistent redemption data" or "evidence obtained through [an EBT] transaction report." 7 C.F.R. § 278.6(a). Indeed, one of the advantages of replacing traditional paper food stamps with the EBT system was that it made it easier to detect trafficking, *see* 5 West's Fed. Admin. Prac. § 5785 (3d ed.), particularly in more closely-knit communities where undercover evidence can be difficult and costly to obtain.

Idias contends, however, that the quantum and types of documentary evidence presented by the United States were insufficient to prove food stamp trafficking. Certainly Idias managed to controvert some of the Government's evidence. For instance, Idias produced wholesale invoices demonstrating that the Supermarket carried a sufficient number of food stamp-eligible items to justify large purchases. Idias also introduced affidavits from some of the customers whose transactions had been flagged as questionable, each of whom denied ever having received cash in exchange for using an EBT card.

Yet what Idias struggled to explain before the district court was how food stamp debits ever could have exceeded the Supermarket's entire recorded gross sales for any given day. There are, of course, three possible explanations. The first is that the food stamp debits were accurate and the register tapes were not. Idias then was making actual sales, but not ringing them up on the register, in order to evade paying the proper taxes. The second is that the register tapes were accurate and the food stamp debits were not. Idias then was accepting food stamps for sales that never took place, while customers were receiving cash instead of merchandise. The final explanation is that both the register tapes and the food stamp debits were inaccurate, which would not conclusively have established which offense — tax evasion or food stamp trafficking — Idias had committed.

Idias, however, removed all doubt on this score. Idias testified that the amount listed daily on the register tapes as "gross sales" documented everything sold in the Supermarket. As Idias put it, "That's the bottom line for the day." Idias's accountant, Lawrence Alford, was even more explicit. When asked whether EBT debits could ever exceed gross sales for a given day, Alford replied, "No way." Alford explained, "First off, [Idias is] not gone [sic] have more sales than goes through the register. Secondly, I know that it's not gone [sic] be all food stamp people come in that day without somebody else coming in that's not eligible for . . . food stamps or [Women, Infant, and Children vouchers]." Thus, according to Idias and Alford, all sales passed through the Supermarket's register and were recorded on the register tapes. By their own admissions, if food stamp debits exceeded gross sales, it was because Idias was exchanging food stamps for cash rather than merchandise.

Perhaps that is why Idias backpedaled before the district court, asserting that there simply must have been EBT sales that were not entered into the cash register at all. Yet Idias provided no evidence in support of his speculation, nor did he explain why he earlier had been mistaken to claim that all sales were recorded in the register. Then, at oral argument before this Court, Idias's counsel backpedaled even farther, claiming that the discrepancies between the food stamp debits and gross sales were the deliberate result of Idias's attempted tax evasion. Again, counsel provided no evidence to substantiate his effort to trade one fraud charge for another.

At day's end, then, the United States supported the administrative decision to disqualify the Supermarket from the Food Stamp Program with extensive documentary evidence of a pattern of food stamp trafficking. In response to the United States's most incriminating evidence — that on three different days food stamp debits exceeded the Supermarket's recorded gross sales — Idias offered only an ever-shifting story that left him guilty of first one offense and then another. The district court properly concluded not simply that a preponderance of the evidence proved food stamp trafficking, but that Idias's weaving tale could not survive summary judgment, *see, e.g.*, *Guinness PLC v. Ward*, 955 F.2d 875, 883, 901 (4th Cir. 1992).

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.