# United States Court of Appeals
## For the First Circuit

No. 00-2230

UNITED STATES OF AMERICA,

Appellee,

v.

ROTH CHHIEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

Elizabeth L. Prevett, Federal Defender Officer, for appellant.
William E. Morse, Assistant United States Attorney, with whom Paul M. Gagnon, United States Attorney, and Jean B. Weld, Assistant United States Attorney, were on brief, for appellee.

September 24, 2001

**SELYA, Circuit Judge.** A jury convicted defendant-appellant Roth Chhien of possessing five grams or more of crack cocaine, intending to distribute it. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii). The district court sentenced him as a career offender. Chhien now appeals, assigning error both to the district court's denial of his pretrial motion to suppress evidence and to its sentencing determination. We affirm.

## I. BACKGROUND

During the afternoon of August 21, 1998, the appellant — a twenty-nine year old native of Cambodia — drove north on Interstate Route 93 in Salem, New Hampshire. He was traveling at the speed limit when he passed a state police cruiser stationed on the median strip. The cruiser's sole occupant, trooper Lawrence Holdsworth, observed two violations of state law: the appellant was driving perilously close to the vehicle in front of him and his car was equipped with blue-tinted aftermarket lights.[1] Holdsworth, a member of an elite team (the so-called Enhanced Enforcement Unit) trained to "look beyond the

---

[1] For purposes of this appeal, the appellant effectively concedes that he violated N.H. Rev. Stat. § 265:25.1 (ordaining that "[t]he driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent") and N.H. Rev. Stat. § 266:74.ll (proscribing the use of blue-tinted lights on vehicles other than law enforcement vehicles).

traffic ticket," i.e., to attempt to ferret out serious criminal activity while conducting routine traffic patrols, commenced pursuit.

Holdsworth signaled the appellant to pull his car to the side of the road. He then approached the driver's side and asked for the appellant's license and registration. After a computer check proved unremarkable, Holdsworth ushered the appellant to the front of his car and inquired about the blue-tinted lights. The appellant acknowledged having purchased them, but claimed that he did so without any awareness of the statutory proscription.

Holdsworth asked if he could conduct a pat-down search for weapons and the appellant acquiesced. During the frisk, Holdsworth felt something "hard" — a "substantial lump" — in the appellant's right front pants pocket. When he inquired about the object, the appellant responded that it was a large wad of cash, totaling $2,000.

Holdsworth grew increasingly suspicious. He began to question the appellant about where he had been and where he was going. The appellant told him that he had bought some stereo equipment in Lowell, Massachusetts, and was heading to his home in Franklin, New Hampshire. He asserted that he had made no stops along the way. The trooper then crossed over to the

-4-

passenger side of the vehicle and posed a similar set of questions to the appellant's companion, Melanie Baker (who had remained seated inside the car throughout the initial phase of the highway stop). Baker verified the trip to Lowell and the purchase of stereo equipment. When asked if she and the appellant had made any other stops, she mentioned that they had driven to the Lowell home of one of the appellant's relatives. Once there, she waited in the car while the appellant went inside.

Returning to the appellant (who was still standing near the front of the car), Holdsworth probed the discrepancy. The appellant immediately amended his story and confirmed that he and Baker had stopped at the home of one of his relatives for a brief visit. But another discrepancy emerged: according to the appellant, both he and Baker had entered the dwelling.

Disturbed by these contradictions, Holdsworth repaired to his cruiser and radioed for assistance. Trooper Timothy Stearns, another member of the Enhanced Enforcement Unit, arrived within a minute or so. Holdsworth was drafting a warning. As the troopers conversed, they noticed Baker's head sink from view and then bob up and down. Curious about these awkward movements, Holdsworth directed Stearns to investigate.

Stearns approached the vehicle.  Baker's hands were clenched and Stearns asked to see them.  Baker refused. Stearns, fearing that Baker had a gun, unsnapped his holster, renewed his demand, and hollered to Holdsworth "she won't show me her hands!"  Holdsworth sprang from the cruiser and ran to assist.  When Stearns repeated his request, Baker finally unclenched her fists and raised both hands.  At that point, Holdsworth yanked her from the car.  The troopers then noticed in plain view on the front passenger seat a small plastic bag containing white powder.

The troopers immediately concluded that the white powder was contraband.[2]  Arrests, Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), and further questioning followed apace.  During this brief roadside interrogation, the appellant admitted that the plastic bag contained crack cocaine purchased in Lowell.  Baker confirmed this tale, adding that she had tried to conceal the contraband when Holdsworth intervened. The troopers then transported the suspects to a nearby station house.

On September 9, 1998, a federal grand jury indicted the appellant for possession with intent to distribute five grams or

_____

[2]They were correct.  Later analysis revealed that the plastic bag contained twenty-eight grams of cocaine base.

more of crack cocaine.[3]    See 21 U.S.C. §§ 841(a)(1),
841(b)(1)(B)(iii).   In due course, the appellant moved to
suppress both the drugs and his statements at the scene of the
highway stop.   After conducting an evidentiary hearing, the
district court denied the motion.   The court concluded that the
roadside confrontation had lasted no longer than five minutes
from start to finish; that this brief detention was reasonable,
given the patent motor vehicle violations; that the appellant
voluntarily consented to the pat-down search; and that, in all
events, the pat-down search and the questioning that followed
did not lead to the discovery of the contraband.   Rather, it was
the troopers' legitimate fear for their own safety, sparked by
Baker's movements, that prompted them to remove her from the car
and displayed the crack cocaine in plain view.   This, in turn,
gave rise to probable cause for the subsequent arrests and
interrogation.

Following some procedural skirmishing (not material
here), the case went to trial in September of 2000.   The jury
found the appellant guilty as charged.   The district court
thereafter classified him as a career offender and imposed a
228-month prison sentence.   This appeal ensued.   In it, the

_____

[3]The grand jury indicted Baker as well, but the government
dropped that charge following her enrollment in a pretrial
diversion program.   She is not a party to this appeal.

appellant argues that the lower court erred both in denying his motion to suppress and in fashioning his sentence.  We address these assignments of error separately.

## II.  THE FOURTH AMENDMENT ISSUE

When reviewing the district court's disposition of a motion to suppress, we accept the court's findings of fact unless clearly erroneous and evaluate its legal conclusions de novo.  United States v. Sowers, 136 F.3d 24, 26 (1st Cir. 1998); United States v. Schaffer, 87 F.3d 562, 565 (1st Cir. 1996).  Here, the appellant's principal contention is that impermissible police tactics transformed a routine highway stop into an unconstitutional fishing expedition — an expedition that ultimately led to the contraband and the confession.  To place this contention into perspective, we begin by discussing the legal framework surrounding such stops.  Moving from the general to the specific, we then grapple with the various components of the appellant's argument.

### A.  The Legal Landscape.

A traffic stop, by definition, embodies a detention of the vehicle and its occupants.  It therefore constitutes a seizure within the purview of the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653 (1979).  This means, of course, that the stop must be supported by a reasonable and articulable

suspicion of criminal activity, see Berkemer v. McCarty, 468 U.S. 420, 439 (1984), and that the detention must be reasonable under the circumstances, United States v. Whren, 517 U.S. 806, 809-10 (1996).

Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity. United States v. Sokolow, 490 U.S. 1, 7 (1989). By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime. United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Velez-Saldana, 252 F.3d 49, 52 (1st Cir. 2001). Reasonable suspicion, then, is an intermediate standard — and one that defies precise definition. Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances. Florida v. Royer, 460 U.S. 491, 500 (1983). In mulling those circumstances, an inquiring court must balance "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." Sowers, 136 F.3d at 27 (quoting United States v. Hensley, 469 U.S. 221, 228 (1985)). To keep this balance true, the court must make a practical, commonsense judgment based on

-9-

the idiosyncracies of the case at hand.  Ornelas v. United States, 517 U.S. 690, 695-96 (1996).

To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau — the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed.  Sowers, 136 F.3d at 27.  Formulating the answers to these queries demands a margin of flexibility.  After all, while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.  Id.; see also Terry v. Ohio, 392 U.S. 1, 10 (1968) (observing that "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess").

## B. **The Merits**.

In this instance, the appellant does not question the legitimacy of the initial detention:  Holdsworth clearly had cause to stop him for tailgating and operating an automobile equipped with blue-tinted lights.  See supra note 1.  He asserts

-10-

instead that Holdsworth exceeded the scope of a permissible traffic stop by conducting an unnecessary, unauthorized pat-down search and wandering far afield in his questioning.

The appellant's thesis proceeds along the following lines. The pat-down search was involuntary, despite the apparent consent, because Holdsworth still held the appellant's license and registration, rendering the confrontation unduly coercive. Even if the frisk passes muster, this thesis runs, Holdsworth's query about the bulge in the appellant's pocket was beyond the pale because it did not pertain either to the trooper's safety or to the underlying traffic violations. Moreover, the questions concerning the appellant's itinerary also were out of bounds. The combination of these toxic ingredients — the coerced pat-down search and the improper questions — impermissibly prolonged the detention and led Holdsworth to call for assistance; the delay made Baker nervous, inducing her to squirm in her seat; this fidgeting ultimately led the troopers to the contraband; and that discovery prompted the appellant's confession. Cf. The Real Mother Goose 82-104 (1916) ("For want of a nail . . . . the kingdom was lost."). Thus, the appellant concludes, the district court should have excluded the drugs and the incriminating statements as the rotten fruit of a tainted traffic stop.

This argument is cleverly constructed and ably presented, but it cannot withstand careful scrutiny. In our view, the consensual pat-down search was fully appropriate and yielded information which gave Holdsworth reasonable suspicion to continue on the minimally intrusive path that he chose to pursue. The questions that followed the frisk, though not directly linked to the purposes of the stop, were reasonably related to automobile travel in general and neither fundamentally altered the nature of the detention nor unreasonably prolonged it. Thus, we reject the appellant's argument.[4]

We start with the pat-down search — which amounts to a Terry stop within a Terry stop. Normally, Holdsworth would have needed some justification (such as a reasonable fear for his own safety) beyond the traffic violations simplicter to engage in it. See Terry, 392 U.S. at 27. In this case, however, the appellant explicitly consented to the frisk. The district court found specially that this consent was voluntary. Unless this finding is clearly erroneous, we must accept it.

---

[4]We are cognizant that our reasoning differs somewhat from that of the district court, but we may affirm a district court's suppression ruling on any ground made manifest by the record. See, e.g., United States v. Doe, 61 F.3d 107, 111-12 (1st Cir. 1995).

-12-

See <u>United States</u> v. <u>Coraine</u>, 198 F.3d 306, 308-09 (1st Cir. 1999).

We discern no error. Consent is voluntary if it is "the product of an essentially free and unconstrained choice." <u>Schneckloth</u> v. <u>Bustamonte</u>, 412 U.S. 218, 225 (1973) (citation omitted). There is not a shred of evidence here that Holdsworth tricked, threatened, or bullied the appellant into agreeing to the pat-down search.

In an effort to fill this void, the appellant argues that the situation itself was inherently coercive (and, thus, that he could not have consented voluntarily).[5] But the traffic stop occurred in broad daylight, on a major thoroughfare. At the time of Holdsworth's request, his sidearm was holstered and he was the only trooper present. Although he still had the appellant's license and registration in hand, that fact alone does not vitiate the operator's consent. <u>See</u> <u>United States</u> v. <u>Purcell</u>, 236 F.3d 1274, 1281-82 (11th Cir.) (holding consent to search voluntary despite officer's retention of operator's license and registration during traffic stop), <u>cert.</u> <u>denied</u>, 121

---

[5]The appellant also suggests that his consent was involuntary because the trooper did not inform him that he could decline to permit a search. This suggestion overlooks that the Supreme Court has held, recently and squarely, that an officer conducting a highway stop need not inform the driver that he is free to go before requesting permission to conduct a search. <u>Ohio</u> v. <u>Robinette</u>, 519 U.S. 33, 40 (1996).

S. Ct. 2615 (2001); see also Florida v. Bostick, 501 U.S. 429, 435-36 (1991) (explaining that consent can be voluntary even though the detainee does not feel free to leave); United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993) (stating that custody alone does not create the kind of coercive atmosphere that abrogates consent).

The short of it is that, in most cases, the voluntariness of consent is a matter of fact to be determined from all the circumstances. Schneckloth, 412 U.S. at 248-49. The district court obviously understood that reality and found the facts with care. Based on its supportable factual findings, we uphold the constitutionality of the pat-down search.

In an effort to blunt the force of this conclusion, the appellant argues that, even if his consent was validly obtained, Holdsworth exceeded the scope of a consensual pat-down search. This argument hinges on the assertion that the trooper should not have asked about the bulge in the appellant's pocket because he knew that the bulge was not a weapon. This argument misconstrues applicable Fourth Amendment jurisprudence. While an officer may not seize an object during a Terry frisk unless he has probable cause to believe that it is contraband, Minnesota v. Dickerson, 508 U.S. 366, 376 (1993); United States v. Schiavo, 29 F.3d 6, 9 (1st Cir. 1994), he is not prohibited

-14-

from inquiring, upon reasonable suspicion, into the nature of that object. So it was here: the origins of the bulge were not readily apparent — it might well have been a weapon — and Holdsworth's question was directly pertinent to the safety concerns that prompted his request for a pat-down search in the first place. We hold, therefore, that the trooper's inquiry was well within the boundaries set by the Constitution.

We next proceed to the trooper's questions about the appellant's peregrinations. When the appellant explained that he was carrying $2,000 in cash, Holdsworth's suspicions understandably escalated. Evaluating whether an officer's suspicions are (or are not) reasonable is a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances. Royer, 460 U.S. at 500. In carrying out that task, "[d]eference is due to the experienced perceptions of the officer[]." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir.), cert. denied, 531 U.S. 1035 (2000). Mindful of that deference, we conclude that the trooper's heightened suspicions (and, hence, his continued questioning) were reasonable here.

The appellant resists this conclusion, insisting that the mere possession of a large, unexplained amount of cash, without more, cannot be the basis for heightened suspicion. As authority for this proposition, he cites Sokolow, in which the

Supreme Court indicated that paying for an airline ticket with $2,100 in cash might be consistent with innocent travel. 490 U.S. at 9. Contrary to the appellant's importunings, this statement does not mean that the possession of a large, unexplained sum of cash can never support reasonable suspicion.[6] The circumstances matter, as does the degree of intrusiveness of the continued detention. See Lopez-Lopez v. Aran, 844 F.2d 898, 905 (1st Cir. 1988) (explaining that the degree of intrusiveness of a stop must be proportional to the degree of suspicion that prompted the intrusion); United States v. Berryman, 717 F.2d 651, 657 (1st Cir. 1983) (similar). In the circumstances of this case, we rule that the discovery of the cash justified a brief period of additional questioning. Cf. Conrod v. Davis, 120 F.3d 92, 97 (8th Cir. 1997) (holding that discovery of $6,000 cash in a suspect's pocket and $4,000 in his suitcase furnished reasonable suspicion).

This brings us to the nature of the questioning. The appellant asseverates that travel questions, unrelated to the purpose of the original stop, are highly intrusive, unsupported by reasonable suspicion of a separate crime, and therefore not

---

[6]Indeed, in Sokolow itself the Court held that the cash purchase, together with other indicia, supported a reasonable suspicion sufficient to justify an investigative stop. 490 U.S. at 11.

-16-

permissible in the course of the highway stop. We disagree: we believe that this line of inquiry was lawful under the circumstances.

The appellant strives to paint the picture in black and white. Citing cases such as United States v. Childs, 256 F.3d 559, 566 (7th Cir. 2001), and United States v. Holt, 229 F.3d 931, 936 (10th Cir. 2000),[7] he asserts that an officer carrying out a traffic stop must have some reasonable, substantial, and independent source of suspicion about a different crime before he can ask questions unrelated to the violation that justified the stop in the first place. But that depends on the nature of the questions. Both of the cited cases involved traffic stops of persons previously suspected of other crimes, during which the officers, for no apparent cause, began to ask directly inculpatory questions involving the antecedent crimes. See Childs, 256 F.3d at 561-62, 566 (involving questions about drug possession during a stop for a broken windshield); Holt, 229 F.3d at 933, 940 (involving questions about weapons during a

---

[7]We do not dwell on the appellant's reference to United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999). The stop there lasted for nearly half an hour, id. at 1218, and the Eleventh Circuit subsequently limited Pruitt to situations in which the unrelated questions unreasonably prolonged the search. See Purcell, 236 F.3d at 1280. Here, however, the district court supportably found that the entire stop lasted no more than five minutes, and there is no proof of unreasonable prolongation.

stop for a seatbelt violation). Such scenarios, in which an officer stops a car for a minor traffic infraction and asks a known suspect pointed questions about a serious crime unrelated to the original violation, raise legitimate concerns about abuse of authority. See Whren, 517 U.S. at 810 (acknowledging the temptation to use traffic stops as a means of investigating unrelated criminal activity).

The case at bar does not lend itself to this sort of black-and-white characterization, but, rather, involves more muted shades of gray. Here, the record contains no evidence that the stop was a pretext to furnish the trooper with a forum to ask questions about other crimes; prior to this encounter, Holdsworth neither knew the appellant nor knew of him. The record is equally barren of any evidence that the trooper's membership in the Enhanced Enforcement Unit impermissibly colored his approach. More important, Holdsworth did not stray far afield, merely posing a few prosaic questions about the appellant's itinerary: where he and his passenger had been, where they were going, and whether they had stopped along the way. Routine questioning of this sort, even when not directly related to the violations that induced the stop in the first place, is not uncommon during a highway stop. See, e.g., United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995) (upholding

-18-

"routine questioning" about travel plans during stop for speeding); United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995) (similar).

To cinch matters, it was not until Holdsworth's suspicions were aroused by the large, unexplained wad of cash that his questioning expanded beyond the bare bones of the traffic stop and the consensual frisk. Since the trooper lawfully learned about the cash — the appellant, after all, consented to the pat-down search and voluntarily described the composition of the discerned bulge — that discovery elevated his suspicions to a degree sufficient to continue the detention briefly and in a minimally intrusive way. See Sowers, 136 F.3d at 27 (approving increasingly intrusive unrelated questions after suspicions escalated during a traffic stop); United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993) ("If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions."). The travel questions that followed were within the ambit of that authority, and any effect they might have had on the duration of the detention — and the state of Baker's nerves — was therefore permissible. Consequently, both the bag of crack cocaine and the appellant's incriminating statements were lawfully obtained.

## III.  THE SENTENCING ISSUE

The appellant's second complaint involves sentencing. Based on the weight of the seized crack cocaine, the district court initially set the appellant's base offense level at 28. See USSG §§2D2.1(b)(1), 2D1.1(c)(6) (Nov. 1998).  The court then determined that the appellant was a career offender and adjusted his offense level to 34.  See id. §§4B1.1, 4B1.2.[8]  This yielded a guideline sentencing range of 262-327 months.  The district court departed downward, however, and imposed a sentence of 228 months.  See id. §4A1.3 (authorizing a downward departure if the defendant's criminal history category significantly exaggerates the gravity of his criminal past or the likelihood of recidivism).

To be sure, the sentence seems severe.  But appellate courts do not have the luxury of resolving sentencing appeals based upon subjective value judgments.  The pivotal question, then, is whether the sentence conforms to the guidelines.

The appellant posits that the district court erroneously classified him as a career offender.  A defendant is

---

[8]The career offender guideline specifies an offense level of 34 where the statutory maximum sentence for the count of conviction is 25 years or more (but less than life in prison). See USSG §4B1.1.  The statutory maximum for possession with intent to distribute five grams or more of crack cocaine is 40 years.  See 21 U.S.C. § 841(b)(1)(B)(iii).

a career offender if "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." Id. §4B1.1. The appellant unarguably meets the first two benchmarks. The issue here is whether the court appropriately considered, as predicate offenses sufficient to satisfy the third requirement, the appellant's prior convictions for three counts of burglary of a commercial dwelling in violation of N.H. Rev. Stat. § 635:1.

In the last analysis, the appellant's claim reduces to his insistence that his prior state-court convictions for commercial burglary should not count as "crime[s] of violence" under the third furculum of the career offender guideline. Deciding where state-law crimes fit along a federal continuum is tricky business. In this instance, however, the decisional path is well-trodden. We conclusively answered the question that the appellant seeks to raise in United States v. Fiore, 983 F.2d 1 (1st Cir. 1992). There, dealing with a materially indistinguishable Rhode Island burglary statute, we held that burglary of a commercial premise constitutes a crime of violence

within the purview of the career offender guideline. _Id._ at 4-5.

That effectively ends this aspect of the matter. Although the circuits are split — some courts have followed _Fiore_'s lead, _see_, _e.g._, _United States_ v. _Wilson_, 168 F.3d 916, 926 (6th Cir. 1999); _United States_ v. _Haskell_, 76 F.3d 902, 905 (8th Cir. 1996), whereas others have reached a different conclusion, _see_, _e.g._, _United States_ v. _Spell_, 44 F.3d 936, 938 (11th Cir. 1995); _United States_ v. _Smith_, 10 F.3d 724, 732-33 (10th Cir. 1993) (per curiam) — we have stalwartly adhered to _Fiore_. _See_, _e.g._, _United States_ v. _Sawyer_, 144 F.3d 191, 196 (1st Cir. 1998). This is in keeping with "the law of the circuit" doctrine. That doctrine holds a prior panel decision inviolate absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course. _See_ _Williams_ v. _Ashland Eng'g Co._, 45 F.3d 588, 592 (1st Cir. 1995). Neither circumstance exists here.

The appellant has two rejoinders. First, he draws our attention to _Stinson_ v. _United States_, 508 U.S. 36 (1993), a case in which the Supreme Court held that the Sentencing

Commission's guideline commentary comprises binding authority. Id. at 46-47. Stinson does not aid the appellant's cause. Although Fiore drew on outside sources to elucidate the meaning of the guidelines where the commentary was opaque, the Fiore court scrupulously applied the discerned dictates of the commentary. See Fiore, 983 F.2d at 4-5. Thus, Stinson supports, rather than undermines, our prior decision.

The appellant next suggests that this court has emasculated Fiore. In an effort to sustain this suggestion, the appellant cites two cases. In the first, United States v. Peterson, 233 F.3d 101, 107-10 (1st Cir. 2000), we held that breaking and entering without any intent to commit a crime is not a violent felony under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). Unlike commercial burglary, however, the breaking and entering charge in Peterson did not require proof of specific intent. The second case is also an ACCA case, United States v. Dueno, 171 F.3d 3 (1st Cir. 1999). We recognized there that, in certain circumstances, definitional differences exist between the ACCA and the career offender guideline. Id. at 6.

We fail to see how either of these opinions casts doubt upon Fiore — a guideline case. In all events, overrulings by implication are disfavored, and, in the best of circumstances,

a panel ought not lightly presume the implicit overruling of an established circuit precedent. See Stewart v. Dutra Constr. Co., 230 F.3d 461, 467 (1st Cir. 2000). We see no principled basis for departing from the settled law of the circuit in this instance. Accordingly, we adhere to our prior holding that burglary of a commercial premise is a crime of violence within the purview of the career offender guideline.

## IV. CONCLUSION

We need go no further. For the reasons stated, we reject the appellant's attacks on both his conviction and his sentence.

**Affirmed.**