# United States Court of Appeals
## For the First Circuit

No. 23-1990

ALAM & SARKER, LLC, a Massachusetts Limited Liability Company,
d/b/a Star Market; MOHAMMAD MAHBUB ALAM, an individual; and MD
MASHUM BILLAH SARKER, an individual,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]
[Hon. Jennifer C. Boal, U.S. Magistrate Judge]

Before

Kayatta, Selya, and Gelpí,
Circuit Judges.

Andrew Z. Tapp and Metropolitan Law Group, PLLC on brief for
appellants.
Joshua S. Levy, Acting United States Attorney, and Michael L.
Fitzgerald, Assistant United States Attorney, on brief for
appellee.

August 27, 2024

**SELYA**, **Circuit Judge**.   We are called upon today to consider the participation of plaintiff-appellant Alam & Sarker, LLC d/b/a Star Market (the Market) in the federal supplemental nutrition assistance program (SNAP).   The case comes to us after the United States Department of Agriculture's Food and Nutrition Service (FNS) sought to bar the Market from participating in SNAP. The Market challenged the agency's determination but made no headway.   When the dispute reached the district court, that court granted summary judgment in favor of the agency.[1]   The Market appeals, advancing a gallimaufry of grievances.  Concluding, as we do, that these grievances are wide off the mark, we affirm the judgment of the district court.

## I

We briefly rehearse the relevant facts and travel of the case.  "Because this appeal follows the district court's entry of summary judgment, we array those facts in the light most favorable to the nonmoving party."  AJ Mini Mkt., Inc. v. United States, 73 F.4th 1, 4 (1st Cir. 2023).

## A

SNAP aims "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among

---

[1] The named defendant in the district court proceedings is the United States.  We use the term "the agency" as a shorthand to encompass the federal government, the United States Department of Agriculture (USDA), and the FNS, collectively.

low-income households." 7 U.S.C. § 2011; see 7 C.F.R. § 271.1. Approved retailers may accept SNAP benefits (commonly known as food stamps) in exchange for "food items that are suitable for 'home consumption.'" Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 375 (1st Cir. 2018) (quoting 7 U.S.C. § 2012(k)); see 7 U.S.C. § 2013(a). These retailers may not dispense cash, hot foods, or non-food items in exchange for SNAP benefits. See Irobe, 890 F.3d at 375; 7 U.S.C. § 2012(k). When a shopper pays with SNAP benefits, he uses an electronic benefit transfer card — which functions like a debit card — through a point-of-sale device to transfer the funds from the household's SNAP account to the store's bank account. See Irobe, 890 F.3d at 375.

The FNS oversees the administration of SNAP benefits. As part of this oversight, the FNS collects data on every SNAP transaction to screen for illicit trafficking in benefits.[2] See id. When the FNS spies irregular transaction data, it customarily assigns the matter to a program specialist, who enlists a contractor to investigate the store in person. See id. If the resulting internal process concludes with a recommendation for further action, the FNS issues a charge letter that explains the allegations against the store and offers the store an opportunity

---

[2] Trafficking in SNAP benefits occurs when a store "accept[s] SNAP benefits in exchange for cash or other proscribed items." Irobe, 890 F.3d at 375; see 7 C.F.R. § 271.2.

to respond.  See id. at 376; see also 7 C.F.R. § 278.6(b).  After the FNS makes an initial determination and reviews any response on behalf of the store, it issues a final agency decision.  See Irobe, 890 F.3d at 376; see also 7 U.S.C. § 2023(a)(3), (5); 7 C.F.R. §§ 279.1(a)(2), 279.5.

The Market is a convenience store located in New Bedford, Massachusetts.  See Alam & Sarker, LLC v. United States, No. 21-11727, 2023 WL 6444379, at *3 (D. Mass. Sept. 29, 2023).  The Market occupies 1,930 square feet, has a solitary checkout counter (which two clerks operate without the assistance of an optical scanner for processing transactions), and has only two or three shopping baskets (but no carts).  See id.  The Market sells some foods that are eligible for purchase using SNAP benefits (such as cereal, eggs, and rice).  See id.  It also sells items that are ineligible for purchase using SNAP benefits (such as cosmetics, cleaning products, and lottery tickets).  See id.

When data submitted to the FNS indicated a series of irregular transactions at the Market, the FNS initiated an investigation into the Market's processing of SNAP benefits.  See id. We sample some of the investigation's findings.  From January to June of 2017, the Market processed thirty-three sets of back-to-back transactions — sets of transactions that were charged to the same SNAP account.  See id.  The FNS refers to rapid and repetitive transactions conducted for the same SNAP household

account in a short period of time (e.g., two minutes) as Scan B2 transactions. For example, on one morning the Market processed a $76.84 transaction at 10:28 a.m. followed by a $25.93 transaction by the same account at 10:30 a.m.

The flurry of purchases stood out because the Market had not processed any Scan B2 transactions in the corresponding six-month period of the preceding year. See id. Moreover, it had processed only one Scan B2 transaction during the period from August through December of 2017. See id. Casting a further shadow on the flurry of Scan B2 transactions, the investigation revealed that two competing convenience stores located less than a mile away processed a combined total of only two Scan B2 transactions during the first six months of 2017. See id. Indeed, the Market — which is located in Bristol County — processed approximately sixty percent more transactions than the county average. See id. at *4.

There was more. From January to June of 2017, the Market processed over 100 transactions that involved unusually high dollar amounts. See id. The FNS referred to such purchases as Scan F transactions. See id. Although the average SNAP transaction in the county during this period totaled $7.57, the Market's average SNAP transaction totaled $8.96 — which is roughly eighteen percent higher than the county average. See id. What is more, the Market recorded 158 transactions over $29 (which included

- 5 -

ninety-two transactions over $50). See id. at *7. In sum, the aggregate dollar amount for SNAP transactions at the Market during this period was about ninety percent higher than the county average. See id. at *4.

These splurges raised some eyebrows at the FNS because the Market had processed only fourteen Scan F transactions in the same six-month period of the preceding year. See id. at *8. By way of comparison, two competitors located less than a mile away processed twenty-eight and fifty-nine Scan F transactions, respectively, during the first six months of 2017. See id. at *4.

**B**

After reviewing these data, the FNS retained a contractor to conduct an in-person investigation. See id. The contractor found that the Market offered goods typical of a convenience store in the area, had only one register, and did not use an optical scanner. See id. As a result of its further investigation, the FNS charged the Market with trafficking. See id.; see also 7 C.F.R. § 278.6(b). The charge letter explained that, "[i]n a series of [SNAP] transactions, multiple transactions were made from individual benefit accounts in unusually short time frames." The letter included a list of those transactions. It also pointed out that "excessively large purchase transactions were made from recipient accounts" and included a list of those transactions. In addition, the letter warned that the Market could

be permanently disqualified from the SNAP program if these allegations were substantiated and advised the Market of its right to respond. See 7 U.S.C. § 2021(a)(1)(A), (b)(3)(B); 7 C.F.R. § 278.6.

The Market denied the allegations contained in the charge letter and gathered its own evidence to rebut the charges. See Alam & Sarker, 2023 WL 6444379, at *4. It produced an assortment of paperwork, including customer statements, photographs, inventory invoices, receipts, and bank statements. See id. Following an administrative review, see id., the FNS issued a final agency decision finding "sufficient evidence . . . to conclude that the questionable transactions and patterns listed in the charge letter were more likely than not the result of trafficking violations." As a sanction, the FNS permanently disqualified the Market from participating in SNAP. See id. Because the Market had failed to make a timely plea that the FNS consider imposing a monetary penalty in lieu of permanent disqualification, the Market forfeited its right to argue for that alternative sanction. See 7 C.F.R. § 278.6(b)(1).

The Market subsequently sued the United States in the district court.[3] See 7 U.S.C. § 2023(a)(13), (15); see also 7

___

[3] The Market's owner and its previous owner (who sold his share in 2021) are also plaintiffs and appellants here. For ease in exposition, we refer to the plaintiffs, collectively, as "the Market."

C.F.R. § 279.7. The case was subsequently referred to a magistrate judge. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(1). Following the close of discovery, the FNS moved for summary judgment. The Market opposed the motion. The magistrate judge was not impressed with the Market's opposition and issued a report and recommendation (the R&R), in which she determined that the transaction data were indicative of trafficking and that the Market had failed to rebut this inference. Accordingly, the magistrate judge counseled the district court to grant summary judgment in favor of the FNS.

The Market objected to this recommendation, see Fed. R. Civ. P. 72(b)(2), but the district court — on de novo review — adopted the R&R and entered summary judgment in favor of the FNS. See Alam & Sarker, 2023 WL 6444379, at *1. The court determined that the magistrate judge had "properly found that [the] FNS ha[d] provided the required sufficient evidence for a reasonable factfinder to conclude that trafficking [had] occurred." Id. In the court's view, the Market had "fail[ed] to identify 'significantly probative' evidence favoring [its] position." Id. (first alteration in original) (quoting Irobe, 890 F.3d at 377). Because the Market had not carried its burden of proof in challenging the agency's decision, the court ruled that the agency was entitled to summary judgment. See id.; see also Irobe, 890 F.3d at 378 (concluding "that[,] when a store challenges the USDA's

- 8 -

determination that the store trafficked in SNAP benefits, the store bears the burden of proving by a preponderance of the evidence that its conduct was lawful").

This timely appeal ensued.

## II

We start by rehearsing the standards of review for summary judgment orders generally and for challenges to SNAP disqualifications specifically.

## A

Our review of an order granting summary judgment is de novo. See Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 54 (1st Cir. 2023). Summary judgment is appropriate if the moving party shows that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. See Fed R. Civ. P. 56(a); see also Burt, 84 F.4th at 54. Under this standard, "[a] fact is 'material' if it 'has the capacity to change the outcome of the [factfinder's] determination.'" Irobe, 890 F.3d at 377 (second alteration in original) (quoting Perez v. Lorraine Enters., 769 F.3d 23, 29 (1st Cir. 2014)). Relatedly, "[a]n issue is 'genuine' if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." Id. (quoting Lorraine Enters., 769 F.3d at 29).

It is the moving party's responsibility to spell out "the basis for [its] motion and identif[y] the portions of the

- 9 -

pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." Id. (alterations in original) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the moving party fulfills this responsibility, the nonmovant must then, "with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Id. (alterations in original) (quoting Borges, 605 F.3d at 5). To make this showing, "[t]he nonmovant must point to materials of evidentiary quality . . . and such materials must frame an issue of fact that is 'more than "merely colorable."'" Id. (quoting Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016)).

**B**

Where, as here, "a store challenges the [FNS's] determination that the store trafficked in SNAP benefits, the store bears the burden of proving by a preponderance of the evidence that its conduct was lawful." Id. at 378. Unlike most administrative challengers, though, the store is entitled to "a trial de novo . . . in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(13), (15); see 7 C.F.R. § 279.7(c). For the court to conduct a trial de novo, it must be allowed to peer beyond the agency record to any additional facts that the parties

- 10 -

appropriately present to it.  See Irobe, 890 F.3d at 376-77.  In other words, the court must examine "'the entire matter' instead of simply determining 'whether the administrative findings are supported by substantial evidence.'"  Id. at 376 (quoting Ibrahim v. United States, 834 F.2d 52, 53 (2d Cir. 1987)).

### III

At the outset, the Market takes umbrage with our caselaw on SNAP disqualifications.  It asks that we overrule Irobe to the extent that Irobe permits an inference of trafficking from transaction data.  See id. at 379-81.  In support, the Market insists that our reliance on irregular transaction patterns — "without so much as a scintilla of admissible evidence" otherwise in support of trafficking — is problematic.  The reasoning and holding in Irobe takes center stage in our ensuing discussion.

### A

In Irobe, we affirmed the district court's grant of summary judgment in favor of the USDA after the USDA had permanently disqualified a convenience store from participating in SNAP benefits.  See id. at 374, 376.  This sanction followed the agency's determination that the store had engaged in trafficking. See id. at 376.  In reaching this conclusion, the agency "relie[d] primarily on transaction reports derived from the [SNAP] database, which analyzed all available statistical information concerning the [s]tore's handling of SNAP benefits during the [relevant]

- 11 -

period." Id. at 379. We accepted the use of these transaction reports because "Congress has expressly authorized consideration of both transaction information gleaned from [SNAP] databases and reports of on-site investigations as tools in the USDA's efforts to detect fraud." Id.; see 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a). And we concluded that SNAP transaction data provided "circumstantial evidence of fraud[] sufficient to prove that a store is trafficking in SNAP benefits." Irobe, 890 F.3d at 379.

This is a common-sense proposition. When a store frequently processes SNAP transactions for dollar amounts that are significantly higher than those of the transactions processed by similar stores in the same vicinity, the factfinder may reasonably infer that trafficking has occurred. See id. So, too, when a small store with limited inventory repeatedly processes high-dollar-amount SNAP transactions in a rapid-fire manner, the factfinder may reasonably infer that trafficking has occurred. See id.

In Irobe, the store's contrary evidence consisted mainly of the owner's deposition testimony, which featured generalized statements about customer behavior. See id. at 380. We deemed that testimony insufficient to ward of the swing of the summary judgment ax. See id. at 381. Nor did the introduction of a series of receipts showing food purchases from vendors tip the scales. See id. "[T]he mere fact that the [s]tore bought some

- 12 -

SNAP-eligible foodstuffs and sold them to SNAP-qualified households does not insulate it from a finding of trafficking." Id. Based on the stockpile of data that the FNS had collected and the store's "fail[ure] to challenge in any meaningful way the agency's data-compilation methodology, the accuracy of the compiled . . . data concerning SNAP transactions at the [s]tore, [or] the reliability of the agency's historical data," we held that summary judgment in the agency's favor was appropriate. Id. at 380.

**B**

Here, the Market's entreaty that we scrap the Irobe rationale presents a threshold issue. On that issue, the Market asks too much. After all, "newly constituted panels in a multi-panel circuit court are bound by prior panel decisions that are closely on point." San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010). In service of this principle, "[w]e have held, time and again, that[,] in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent." United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991).

So it is here. The Market has not identified any such supervening authority — no overruling caselaw, no superseding

statute, and nothing else of consequence.[4]  See United States v. Ríos-Rivera, 913 F.3d 38, 43 (1st Cir. 2019) ("Prior panel decisions generally bind us unless a Supreme Court opinion, en banc ruling, or statute undermines the panel decision.").

In the case at hand, the Market's arguments mirror those of the store in Irobe.  See 890 F.3d at 379-81.  It relies on a handful of receipts and purchase orders along with its owner's anecdotal account of shoppers' habits.  Our holding in Irobe squarely addresses such a challenge.  See id.  There, we determined that the agency could rely on SNAP transaction data as evidence of trafficking.  See id.  At the same time, we examined the store's countervailing evidence, which comprised the store owner's deposition testimony along with receipts showing purchases of foodstuffs.  See id. at 380-81.  Viewed objectively, Irobe is

_____

[4] To be sure, there may be instances in which the weight of authority has shifted so dramatically that overruling a precedential opinion may be within the realm of available courses of action.  See, e.g., United States v. Chhien, 266 F.3d 1, 11 (1st Cir. 2007) (recognizing "rare circumstances[] where non-controlling but persuasive case law suggests" deviating from binding circuit precedent); Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995) abrogated on other grounds by Carpenters Loc. Union No. 26 v. U.S. Fid. & Guar. Co., 215 F.3d 136 (1st Cir. 2000) (acknowledging "relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind").  The case at hand does not fit within the narrow confines of this exception.

- 14 -

directly on point, and we must treat it as binding precedent. See San Juan Cable, 612 F.3d at 33.

The Market's principal rejoinder is a belated request for a hearing en banc so as to reconsider Irobe. In this regard, Federal Rule of Appellate Procedure 35 requires that a petition for "an appeal [to] be heard initially en banc must be filed by the date when the appellee's brief is due." Fed. R. App. P. 35(c). But the Market failed to file a petition for an initial hearing en banc before the date prescribed by Rule 35(c): it requested such review for the first time in its reply brief. Consequently, we must decline the Market's invitation that we sit en banc initially in order to reconsider Irobe.

## C

The Market has another blade in its scabbard. It strives to persuade us that — in Irobe — we did not consider whether transaction data are admissible under prevailing evidentiary rules. We are not convinced.

The Market concedes that, if SNAP transaction data could connect the underlying transactions to trafficking, such data would be admissible. But in its view, these data are not probative of trafficking and, thus, are categorically inadmissible. As the Market tells it, any evidentiary value derives solely from an analysis of the SNAP transaction data.

- 15 -

We do not agree.  In the case at hand, the FNS performed the key analysis (which the district court confirmed in its de novo review).  The FNS defined the Scan B2 and Scan F categories and determined when a store processed enough of these suspicious transactions such that the factfinder could infer that trafficking had occurred.

The Market argues that this kind of lay analysis is insufficient evidence to support an inference of trafficking.  Instead — it theorizes — an expert witness would need to conduct a statistical analysis in order to provide meaningful conclusions about the SNAP transaction data.  And unlike in Irobe, 890 F.3d at 380, the Market challenges the FNS's methodology.  In particular, it disputes the FNS's use of the Scan B2 and Scan F categories and the agency's selection of other stores in the area as comparators.  Given these concerns, the Market argues that the analysis in Irobe is not dispositive of its challenge.

In one important respect, the Market reads Irobe correctly.  That case did not hold that raw numerical transactional data without expert review is always competent to generate an inference that will carry the day if not rebutted by competent evidence.  Rather, it held that the data compiled there were sufficient.  Those data included:

- On fifty-one separate occasions, households used up at least ninety percent of their monthly SNAP

benefits in fewer than nine hours. Historical data indicates that it is markedly inconsistent with the normal shopping behavior of SNAP-qualified households to deplete all or most of a household's allotment in one fell swoop. According to an unchallenged government analysis of SNAP-related shopping patterns, it usually takes a minimum of two weeks for a SNAP-qualified household to deplete eighty percent of its monthly allotment and three weeks to deplete ninety percent of that allotment.

- During the relevant period, the store engaged in 205 high-dollar SNAP transactions, that is, transactions ranging from $174 to $1,050. Yet, historical data indicates that, during 2015, the average SNAP transaction in the Lewiston area was about $45.

- With respect to multiple purchases in quick succession, 103 pairs of SNAP transactions were recorded on the store's point-of-sale device during the relevant period in under nine minutes. These paired transactions included twenty-one pairs of transactions completed in sixty seconds or less and four pairs of

transactions completed in under thirty-nine seconds. Given normal shopping behavior, the practical realities of shopping at the store, and the availability of only a single clerk, these paired transactions raise obvious concerns.

See Irobe, 890 F.3d at 379.

Those disparities were stark enough to put the ball into the store's court — but that does not mean that a similar result must pertain either in a case where less stark disparities exist or where evidence suggesting stark disparities was persuasively explained away. After all, there is a difference between a coin that flips to heads four out of five times and a coin that flips to heads ten out of ten times.

All that being said, we conclude that the numerical data here is enough to generate an inference of fraud in the absence of a statistical rebuttal or competent evidence of an alternative explanation for the apparent disparity. A change from fourteen scanned transactions in a six-month period to 158 in the next period, combined with thirty-three Scan B2 transactions as compared to two for two reasonable comparators, is stark enough to call for an explanation founded on competent evidence. In fine, the factual differences between this case and Irobe are not enough to distinguish it, so as a subsequent panel, we must follow Irobe. See San Juan Cable, 612 F.3d at 33.

Battling on, the Market contends that, even if Irobe controls, the district court erroneously entered summary judgment because the data analysis underlying the determination that it had trafficked in SNAP benefits presented a genuine issue of material fact. Given that our review is de novo, we accord no deference to the agency's finding that trafficking had occurred. See Irobe, 890 F.3d at 379.

A

Our starting point is the FNS's evidentiary showing. The party seeking summary judgment must identify the relevant evidence and legal basis to demonstrate that the record — construed in the light most favorable to the nonmovant — presents no genuine issue of material fact and entitles the movant to judgment as a matter of law. See Borges, 605 F.3d at 5. Once the movant makes such a showing, the nonmovant must adduce "significantly probative" evidence of a genuine dispute about a dispositive issue to avoid summary judgment. Anderson, 477 U.S. at 249-50.

Here — as in Irobe — the agency built its case on inferences drawn from SNAP transaction data. See Alam & Sarker, 2023 WL 6444379, at *6-8. The Market processed a vastly disproportionate number of Scan F transactions relative to its sales during the same six-month period one year earlier and relative to other stores in the area. See id. at *4, 8. So, too,

the Market processed thirty-three Scan B2 transactions when it had processed no such transactions during the same six-month period one year earlier and two other similar stores processed a combined two of these transactions. See id. at *3.

We agree with the district court that these facts suffice to ground a strong inference that trafficking had occurred. See id. at *8; see also Irobe, 890 F.3d at 380 (concluding that "large number of aberrational transactions reflected in the Store's [SNAP] database [were] adequate to ground a strong inference of trafficking"). And although "[i]rregular patterns may emerge in virtually any retail operation, . . . a drumbeat of irregularities can be highly probative of unlawful conduct." Id. Once the FNS had cleared this hurdle, the burden shifted to the Market to rebut the inference of trafficking. See Anderson, 477 U.S. at 249-50.

**B**

The Market points out that the pertinent regulations do not specifically prohibit Scan B2 or Scan F transactions. Nor do they prohibit large numbers of either type of transaction. Thus — in the Market's view — the agency's case rests entirely on comparisons to transactions from the previous year and transactions from other stores. The Market submits that this evidence does not meaningfully cut in the agency's favor.

To begin, the Market notes that the contractor's report did not accurately document its inventory or its shoppers'

purchasing habits.  This, in turn, led the agency to use dissimilar stores as comparators.  The Market's fallback position is that its higher volume of SNAP transactions relative to those of other stores can be explained by its more copious inventory.

We turn first to the contractor's report.  The Market asserts that the report omitted images of its storeroom and failed to mention that it sold cases of soda and frozen shrimp.  The record belies these assertions:  the report included images of the storeroom and noted that the Market sold frozen shrimp.  To be sure, the report related that the Market sold individual bottles of soda instead of cases of soda — but this seems to be a distinction that makes no difference.  Importantly, none of this blunts the thrust of the SNAP transaction data.

The Market's "inventory" defense simply does not move the needle.  To be specific, evidence of a larger inventory that includes some more expensive goods does not explain why the Market processed so many back-to-back transactions in rapid succession for a single SNAP account.  Nor does that evidence explain the volume of high-dollar transactions that the Market processed.  Put another way, the Market failed to adduce evidence to show that it maintained a large supply of pricey items and that it sold those items frequently enough to explain the disproportionate number of Scan F transactions.

The Market also complains that the other stores to which the agency compared it ran significantly different operations. It suggests that it should have been characterized as an "above average convenience store," which would distinguish it from the comparators that the agency used. This complaint, however, was not advanced before the district court and, thus, we deem it waived. See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("[A]bsent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.")

The Market also attempts to attach significance to a supposed lack of local competition. That attempt is fruitless: the lack of local competition might result in an increase in sales and in the average sale price. But the absence of competition fails to explain other suspicious attributes, such as the rapid-fire nature of many of the transactions. To cinch the matter, the Market adduced no probative evidence that its theory of competition played out in practice. We reject the Market's suggestion that we attach decretory significance to theoretical economic forces, when that theorizing is contradicted by evidence that shoppers frequented other establishments in the area.

Finally, the owners' testimony describing the nature of the Market's business does not gain the Market any traction. As

we previously have made clear, a store owner's unsupported generalized, and conclusory observations about customers' predilections are insufficient to contradict reasonable inferences drawn from concrete SNAP transaction data. See Irobe, 890 F.3d at 381.

The short of it is that the Market failed meaningfully to rebut the strong inference of trafficking that flows from the agency's evidence. Thus, a rational factfinder — employing a preponderance of the evidence standard — could not reach any conclusion except that the Market had engaged in SNAP trafficking. It follows that the district court did not err in entering summary judgment in favor of the agency.

**V**

The Market launches one last-ditch argument. It contends that the process by which it was disqualified violated due process because the FNS never advised it of the alleged misconduct with sufficient particularity.[5] In the Market's estimation, the charge letter accused it of trafficking based on irregular transaction data but failed to provide a "description or

---

[5] This argument relies on a lack of proper notice and does not claim that any infirmity exists with respect to the substance of any statute or regulation. Thus, we treat the challenge as one sounding in procedural due process and deem any substantive due process challenge to be waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

allegation of what specific activity . . . qualifie[d] as trafficking." This contention lacks force.

When the government accuses a party of violating the law, the Constitution guarantees certain procedural protections. See In Re Gault, 387 U.S. 1, 33 (1967). As relevant here, the government "must set forth the alleged misconduct with particularity." Id. (quotation omitted). This required "notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." Spinelli v. City of New York, 579 F.3d 160, 172 (2d Cir. 2009).

We have yet to adjudicate a procedural due process challenge in the SNAP-disqualification context. Even so, our decision is informed by the approaches that other courts of appeals have developed in considering procedural due process challenges in SNAP-disqualification cases.

In Traficanti v. United States, the Fourth Circuit held that, "[e]ven assuming arguendo that a procedural due process violation existed at the administrative level, the de novo hearing in the district court cured the violation." 227 F.3d 170, 175 (4th Cir. 2000) (emphases in original). To like effect, in Kim v. United States, the Ninth Circuit held that "[a] trial de novo, in which the existence of a violation is examined afresh, and the parties are not limited in their arguments to the contents of the

administrative record, satisfies the strictures of procedural due process." 121 F.3d 1269, 1274 (9th Cir. 1997). And in <u>TRM, Inc. v. United States</u>, the Eleventh Circuit held that "[a] de novo hearing in the district court adequately protects an aggrieved store owner's procedural due process rights." 52 F.3d 941, 944 (11th Cir. 1995).

We share the view of our sister circuits. Inasmuch as the Market received a trial de novo in the district court in which it could examine and dispute the full range of evidence against it, we hold that it received all the process that was due. Consequently, this claim of error founders.[6]

## VI

We need go no further. For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.

---

[6] In light of the foregoing, it is unnecessary for us to offer any opinion on whether the agency satisfied the strictures of due process. <u>See</u>, <u>e.g.</u>, <u>Traficanti</u>, 227 F.3d at 175.